**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ELIJAH SELESNICK, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TRANSUNION LLC,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Elijah Selesnick, individually and on behalf of all others similarly situated ("Plaintiff"), brings this action against TransUnion LLC ("TransUnion" or "Defendant"). Plaintiff makes the following allegations based on personal knowledge as to his own actions and experiences, and upon information and belief as to all other matters, which are grounded in the investigation conducted by and through Plaintiff's counsel. Plaintiff further believes that substantial additional evidentiary support will emerge for these allegations following a reasonable opportunity for discovery.

## NATURE OF ACTION

1. TransUnion is a global information company and one of the three major credit bureaus in the United States. It provides credit and public record data to businesses and consumers, along with services such as credit risk management, fraud prevention, identity verification, and marketing analytics. TransUnion also offers consumer tools including credit monitoring, fraud alerts, and personalized credit offers. To support these services, TransUnion maintains credit files

on more than one billion consumers worldwide—including approximately 200-million in the United States—containing information about their credit history and financial activity. Operating for over 50 years, TransUnion now serves over 65,000 business clients across 30-countries, including lenders, insurers, and employers.

2. Accordingly, TransUnion plays a central role in the modern American economy by collecting and selling vast amounts of data about consumers' financial lives. This data—including names, dates of birth, Social Security numbers, driver's license numbers, and other identifiers—holds the keys to a consumer's identity and is routinely relied upon by third parties to make critical financial decisions affecting nearly every American.

3. TransUnion recognized its enormous responsibility to safeguard the data it collects and publicly assured consumers that it "is committed to data privacy" to "secure and protect the information entrusted to [it] by building, monitoring and defending security ecosystem built on a foundation of compliance and accountability."[1] In reality, TransUnion failed to live up to those assurances. On August 26, 2025, Defendant announced a massive data breach (the "Data Breach") that compromised the personal information of millions of consumers.[2]

4. Here, however, TransUnion failed to properly secure and safeguard the highly valuable, PII of millions of US consumers, including their names, Social Security numbers, dates of birth, phone numbers, home addresses, and other personal information (collectively, "Private Information" or "PII").[3] TransUnion also failed to comply with industry standards to protect

---

[1] *Consumer Privacy Rights,* TRANSUNION (2025), https://www.transunion.com/consumer- privacy (last visited on Sep. 15, 2025).

[2] *Data Security,* TRANSUNION (2025), https://www.transunion.com/client-support/data-security. (last visited on Sep. 15, 2025).

[3] Adam Hardy, *Credit Bureau TransUnion Confirms Data Breach Affecting Over 4 Million People,* MONEY (August 29, 2025), https://money.com/transunion-data-breach/#:~:text=TransUnion%20confirmed%20an%20unauthorized%20%E2%80%9Ccyber,according%20to%20the%20Texas%20filing. (last visited on Sep. 15, 2025).

information systems that contain Private Information and failed to provide timely and adequate notice to Plaintiff and other members of the Class that their Private Information had been accessed and compromised.

5. As a result of TransUnion's inadequate security and breach of its duties, the Private Information of Plaintiff and Class Members was disclosed to unauthorized criminal actors. Plaintiff and Class Members have suffered injuries directly and proximately caused by Defendant's conduct, including: (i) out-of-pocket expenses to prevent, detect, and remediate identity theft, fraud, and other misuse of their Private Information; (ii) lost time and opportunity costs spent mitigating the consequences of the Data Breach; (iii) the ongoing and heightened risk that their Private Information will be misused in the future; (iv) the risk that the Private Information still held by Defendant remains vulnerable to further unauthorized disclosure; (v) invasion of privacy and increased risk of fraud and identity theft; (vi) theft of their Private Information and the resulting loss of control over and privacy in that information; and (vii) diminution in value of their Private Information, a valuable form of property that Defendant wrongfully compromised.

6. Private Information stolen in a data breach is especially valuable to cybercriminals because it enables the creation of convincing, personalized phishing schemes. The personal data exfiltrated here—the full scope of which TransUnion has yet to disclose—gives hackers a detailed portrait of each individual, including their habits, background, and even whereabouts. With this information, criminals can link and enrich data sets, unlock personal accounts, and exploit consumer preferences. In short, the stolen data provides cybercriminals with a master key to victims' personal lives, allowing them to build a comprehensive profile for targeted exploitation.

7. The Data Breach was preventable and stemmed from TransUnion's well-known and avoidable cybersecurity failures. TransUnion failed to implement reasonable measures to

protect its systems against unauthorized intrusion; maintain industry-standard safeguards; enforce strict vendor oversight and access controls; require regular password resets; encrypt the data it stored; and adequately train and audit employees to guard against phishing and other attacks. These systemic lapses left consumers' Private Information vulnerable to theft and misuse.

8. TransUnion failed to adequately monitor the computer networks and cloud-based systems housing the Private Information. Proper monitoring would have detected the intrusion sooner—or prevented it altogether.

**PARTIES**

9. Plaintiff Elijah Selesnick is a natural person and citizen and resident of New Jersey.

10. Defendant TransUnion LLC is a Delaware limited liability company, with its principal place of business in Chicago, Illinois. Defendant is one of the "Big Three" credit bureaus in the United States, and, as a result, collects, processes, and stores the information of approximately 200-million Americans, compiling that information into consumer reports which it then sells to 65,000 businesses, including lenders, insurers, and employers, for purposes such as credit risk assessment, fraud prevention, and identity verification.

**JURISDICTION AND VENUE**

11. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(d) because this is a class action where the aggregate amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one Class Member is a citizen of a state different from Defendant. This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

12. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred in this District. Defendant maintains

its principal place of business here, where its directors and officers direct corporate activities—including the actions and inactions that led to the Data Breach. Defendant also derives substantial revenue from business conducted in this District, and Class Members within this District were harmed by the Data Breach.

## FACTUAL ALLEGATIONS

13. TransUnion is a national credit bureau that collects, maintains, and processes the personal data of hundreds of millions of consumers throughout the United States.

14. The information collected and stored by Defendant includes, but is not limited to, personal identifiers such as full names, dates of birth, Social Security Numbers (SSNs), home addresses, and contact information, credit and financial information such as credit account information and balances, payment histories and delinquencies, and credit inquiries and applications, employment information such as current and past employers, and identity verification data such as government-issued ID information, device information, and more.[4]

15. Defendant presents itself as a trustworthy company that values consumer privacy and the protection of personal information. It has repeatedly assured consumers that "[d]ata security and stewardship is vital to consumer protection and enabling trust. At TransUnion, we continually invest in improvements to protect the data we hold on behalf of consumers and businesses." TransUnion likewise claims to "secure and protect the information entrusted to us by building, monitoring and defending [a] security ecosystem built on a foundation of compliance and accountability," and to "proactively manage [its] programs and continuously invest to secure the data [it] hold[s] on behalf of consumers and businesses."[5]

---

[4] *TransUnion Consumer Interactive Privacy Notice,* TRANSUNION (2025), https://www.transunion.com/privacy/consumer-interactive. (last visited on Sep. 15, 2025).

[5] *Data Security,* TRANSUNION (2025), https://www.transunion.com/client-support/data-security. (last visited on Sep. 15, 2025).

16. Plaintiff and the proposed class relied to their detriment on Defendant's uniform representations and omissions regarding data security, including Defendant's failure to alert consumers that its security protections were inadequate, and that Defendant would forever store Plaintiff's and Class Members' Private Information, failing to archive it, protect it, or at the very minimum warn consumers of the anticipated and foreseeable data breach.

***The Data Breach***

17. At all material times, TransUnion failed to maintain proper security measures despite its promises of safety and security to consumers.

18. On July 30, 2025, Defendant learned that an account within its organization, later confirmed to be with Salesforce, had been compromised by an organized cybercrime group two days earlier, on July 28, 2025, exposing the personal information of over 4.4 million individuals across the United States.[6]

19. Defendant failed to immediately notify those affected by the breach. Despite being informed of the cyberattack on July 30, 2025, Defendant kept silent and chose not to notify the affected consumers until almost a month later on August 26, 2025, when Defendant finally began notifying consumers, including Plaintiff, of the Data Breach by mail.

20. Despite the breach exposing the personal information of 4.4 million U.S. consumers—including Social Security numbers—Defendant downplayed the incident by characterizing the compromised data as merely—"limited."

---

[6] *TransUnion suffers data breach impacting over 4.4 million people,* BLEEPINGCOMPUTER (August 28, 2025), https://www.bleepingcomputer.com/news/security/transunion-suffers-data-breach-impacting- over-44-million-people/ (last visited on Sep. 15, 2025)

21. In its statement, Defendant failed to provide all relevant information regarding the Data Breach. Instead, Defendant downplayed the extent of the Data Breach, and the likely harm affected victims may experience.

***Data Breaches and the Commercialization of Personal Information***

22. Personal data has become a precious commodity at the forefront of technological innovation. It is a pivotal economic asset and form of capital, enabling data-rich companies to gain a competitive edge. Given the significance of big data in corporate America and the severe penalties imposed for cyber theft, the value of personal information is self-evident. Even a straightforward risk-to-reward analysis confirms that personal data carries substantial market value.

23. The ability to capture and use consumer data to shape products, solutions, and the overall buying experience is essential to business success. In fact, an entire economy exists related to the value of personal data. In 2023, the big data technology market was valued at roughly $349 billion, and that value is expected to grow from roughly $397 billion in 2024 to $1,194 billion by 2032.[7]

24. According to Pew Research, 81% of U.S. adults are concerned about how companies use the data they collect about them.[8]

---

[7] *Big Data Technology Market Size, Share & Industry Analysis*, FORTUNE BUSINESS INSIGHTS (Jan. 2025), https://www.fortunebusinessinsights.com/industry-reports/big-data-technology-market-100144 (last visited on Sep. 15, 2025).

[8] *How Americans View Data Privacy,* PEW RESEARCH CENTER (Oct. 18, 2023), https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/; *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER (Nov. 15, 2019) (last visited on Sep. 15, 2025); https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused- and-feeling-lack-of-control-over-their-personal-information/ (last visited on Sep. 15, 2025).

25. Data breaches in the United States have become commonplace–the number of breached records increased from 168 million in 2023 to more than 247 million in 2024–with the goal of criminals being to monetize the stolen data.

26. When a victim's data is compromised in a breach, the victim is exposed to serious ramifications regardless of the sensitivity of the data, including but not limited to identity theft, fraud, decline in credit, inability to access healthcare, as well as legal consequences.[9]

27. The U.S. Department of Justice's Bureau of Justice Statistics has found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that resolution of those problems could take more than a year.[10]

28. The U.S. Government Accountability Office (GAO) has concluded that it is common for data thieves to hold onto stolen data for extended periods of time before utilizing it for identity theft. In the same report, the GAO noted that while credit monitoring services can assist with detecting fraud, those services do not stop it.[11]

29. The FTC has recognized that identity thieves can exploit such information to commit a wide range of crimes, including identity theft and financial fraud. A thriving cyber black market exists where criminals openly trade stolen personal information across numerous underground websites on the dark web

30. Further, criminals often trade stolen PII on the "cyber black-market" for years following a breach. Cybercriminals can post stolen PII on the internet, thereby making such information publicly available.

---

[9] *Data Breach Response: A Guide for Business*, FEDERAL TRADE COMMISSION, https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business

[10] *Victims of Identity Theft*, U.S. DEPARTMENT OF JUSTICE, http://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited on Sep. 15, 2025).

[11] *Data Breaches – Range of Consumer Risks Highlights Limitations of Identity Theft Services*, U.S. GOVERNMENT ACCOUNTABILITY OFFICE, https://www.gao.gov/assets/700/697985.pdf

31. When companies entrusted with personal data fail to implement industry best practices, cyberattacks and other data exploitations can go undetected for a long period of time. This worsens the ramifications and can even render the harm irreparable.

32. PII is a valuable commodity for which a black market exists on the dark web, among other places. Personal data can be worth from $1,000 or more on the dark web and the legitimate data brokerage industry is valued at more than $250 billion.[12]

33. In this black market, criminals seek to sell the spoils of their cyberattacks to identity thieves who desire the data to extort and harass victims, take over victims' identities in order to open financial accounts and otherwise engage in illegal financial transactions under the victims' names.

34. In a study authored by Tim Morey, researchers studied the value that 180 internet users placed on keeping personal data secure.[13]

35. Defendant knew or should have known that Plaintiff's and Class Members' Private Information is valuable, both to legitimate entities, like Defendant, and to cybercriminals.

36. Defendant knew or should have known that Plaintiff and Class Members would reasonably rely upon and trust Defendant's promises regarding security and safety of their data and systems, and that their valuable Private Information would be protected.

37. By collecting, using, selling, monitoring, and trafficking Plaintiff's and other consumers' Private Information, and failing to protect it by maintaining inadequate security

---

[12] Ryan Smith, *Revealed-how much is personal data worth on the dark web?*, INSURANCE BUSINESS MAGAZINE, (May 2023), https://www.insurancebusinessmag.com/ca/news/cyber/revealed--how-much-is-personal-data- worth-on-the-dark-web-444455.aspx (last visited on Sep. 15, 2025).

[13] Tim Morey, *What's Your Personal Data Worth?*, DESIGN MIND, (Jan. 2011), https://web.archive.org/web/20131206000037/http://designmind.frogdesign.com/blog/what039s- your-personal-data-worth.html.

systems, failing to properly archive the Private Information, allowing access of third parties, and failing to implement adequate security measures, Defendant caused harm to Plaintiff and other consumers TransUnion held Private Information on.

***Defendant's Duty to Protect Personal Information***

38. Defendant collects, receives, and accesses consumers' extensive individually identifiable information. This Private Information includes full names, home addresses, dates of birth, Social Security numbers, other contact information, government-issued identification information, employment information, and more.

39. Defendant was prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that an entity's failure to maintain reasonable and appropriate data security for individuals' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.,* 799 F.3d 236 (3d Cir. 2015).

40. The FTC has brought enforcement actions against entities engaged in commerce for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

41. The FTC has issued numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all decision-making.[14]

42. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses.[31] The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

43. The FTC further recommends that entities not maintain PII longer than needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[32]

44. Furthermore, the FTC requires that entities like Defendant conduct risk assessments, implement and periodically review access control, encrypt consumer information, implement multi-factor authentication, dispose of consumer information securely, maintain a log of authorized users' activity and keep an eye out of unauthorized access, train employees regarding security awareness, conduct audits, penetration testing, and system wide scans regularly to test for publicly known security vulnerabilities – all of which if properly implemented would have allowed Defendant to prevent this Data Breach.

---

[14] *Start With Security*, FEDERAL TRADE COMMISSION, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf

45. Defendant failed to properly implement basic data security practices, allowing for this data breach to occur, victimizing millions of people – by failing to adhere to many of the FTC protocols and allowing access to a hacker who was able to exfiltrate substantial amounts of consumer data. Defendant should have a multifaceted security protocol in place but failed to do so.

46. Had Defendant maintained proper protocols and regularly conducted audits to ensure its vulnerabilities and training, it would have prevented this Data Breach.

47. Plaintiff and Class Members had the reasonable expectation that TransUnion would comply with its obligations to keep such information confidential and secure from unauthorized access.

48. TransUnion's failure to provide adequate security measures to safeguard Plaintiff's and Class Members' Private Information is especially egregious because it operates in a field which has recently been a frequent target of scammers attempting to gain access to confidential PII.

***Harm to Consumers Resulting from the Data Breach***

49. Plaintiff and the Class have suffered actual harm as a result of Defendant's conduct. Defendant failed to institute adequate security measures that led to a data breach. This breach allowed hackers to access the Private Information, including the names, Social Security numbers, dates of birth, and other personal information of Plaintiff and the Class. Now that the Private

50. Information has been accessed and absconded with, it is available for criminal elements to sell or trade and will continue to be at risk for the indefinite future.

51. Plaintiff and Class Members are now vulnerable to a full gamut of cybercrimes, loss in value of their property, and have been forced to take remedial action.

***Phishing***

52. Phishing scammers use emails and text messages to trick people into giving them their personal information, including but not limited to passwords, account numbers, and social security numbers. Phishing frauds are frequently successful, and the FBI reported that people lost approximately $18.7 million to such scams in 2023 alone.[15]

53. Defendant knew or should have known of the dangers of digital phishing frauds. When Personal Information is employed in a social engineering scheme, criminals can gain unfettered access to individuals, or corporate databases, as the Data Breach itself evinces.

54. Plaintiff and other consumers who lost information in the Data Breach are now more likely to become victims of digital phishing attacks because of the compromised information.

***SIM-Swaps***

55. The data leak can also lead to SIM-swap attacks against Plaintiff and the Class Members. A SIM-swap attack occurs when the scammers trick a telephone carrier to porting the victim's phone number to the scammer's SIM card. By doing so, the attacker is able to bypass two-factor authentication accounts, as are used to access cryptocurrency wallets and other important accounts. The type of personal information that has been leaked poses a profound tangible risk of SIM-swap attacks for the Class.

***Identity Theft***

56. As a direct and proximate result of Defendant's breach of confidence, and failure to protect Private Information, Plaintiff and the Class have also been injured by facing ongoing, imminent, impending threats of identity theft crimes, fraud, scams, and other misuse of this Private

[15] *Internet Crime Report*, FEDERAL BUREAU OF INVESTIGATION, 2023), https://www.ic3.gov/annualreport/reports/2023_ic3report.pdf scams

Information, resulting in ongoing monetary loss and economic harm, loss of value of privacy and confidentiality of the stolen Private Information, illegal sales of the compromised Private Information on the black market, mitigation expenses and time spent on credit monitoring, identity theft insurance, credit freezes/unfreezes, expenses and time spent in initiating fraud alerts, contacting third parties; decreased credit scores, lost work time, and other injuries. Defendant, through its misconduct, has enabled numerous bad actors to sell and profit off of Private Information that belongs to Plaintiff.

***Diminution in Value of a Valuable Property Right***

57. Because personal data is valuable personal property, market exchanges now exist where internet users like Plaintiff and Class Members can sell or monetize their own personal data.

58. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to legitimate marketers or app developers.[36] For example, consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[37]

59. Accordingly, as a result of the Data Breach, Plaintiff lost the sale value of his Private Information and the opportunity to control how it is used. That a threat actor specifically targeted Defendant demonstrates just how valuable Plaintiff's Private Information can be to hackers and the significant value of Plaintiff's Private Information to cybercriminals.

***Defendant Failed but Should Have Invested in Appropriate & Necessary Data Security***

60. In the years immediately preceding the Data Breach, Defendant knew or should have known that its computer systems were a target for cybersecurity attacks.

61. Considering the information and warnings readily available to Defendant before the Data Breach, Defendant had reason to be on guard and to increase data security to avoid an attack.

62. Prior to the Data Breach, Defendant thus knew or should have known that there was a foreseeable risk that Plaintiff's and Class Members' Private Information could be accessed, exfiltrated and utilized by nefarious individuals as the result of a cyberattack.

63. Data security experts advise that "the vast majority of data breaches are preventable" if companies follow widely-available advice on data security practices, including "continually audit[ing] and reevaluat[ing]" their data security practices; being aware of and working proactively to counter cybercriminals' evolving techniques and approaches; and training and re-training their employees.[16]

64. Defendant did not follow this advice; nor did it heed warnings related to recent cybersecurity attacks from cybersecurity industry experts that the ShinyHunters cybercrime group, which confirmed its involvement in the TransUnion data breach, was increasingly targeting customers of Salesforce, which made Defendant a target as it uses software designed and hosted by Salesforce. Had Defendant properly prepared itself and its employees to comply with industry standards, this Data Breach would have been preventable.

***Plaintiff's Experiences***

65. Plaintiff received a data breach notification letter from TransUnion dated September 2, 2025. ("Notification Letter"). The letter indicated that Plaintiff's information had been stolen in a breach of TransUnion's computer systems and as a result, his personal information,

---

[16] Nate Nead, *How To Prevent A Data Breach In Your Company*, FORBES (Jul. 30, 2021), https://www.forbes.com/sites/forbesbusinesscouncil/2021/07/30/how-to-prevent-a-data-breach- in-your-company/?sh=3828f7b918da

including but not limited to his date of birth and social security number, was now controlled by one or more criminal third parties.

66. Defendant collected, stored, maintained, processed, and compiled information on Plaintiff and other Class Members for its own commercial benefits. Plaintiff Lovell reasonably expected that Defendant would use proper security measures to protect his Private Information and prevent its access by unauthorized third parties.

67. As a result of the Data Breach, Plaintiff has been further injured by the damages to and loss in value of his Private Information—a form of intangible property that Defendant possessed and should have kept secure. This information has inherent value that Plaintiff was deprived of when his Private Information was negligently made accessible to and intentionally and maliciously exfiltrated by cybercriminals.

68. When Plaintiff's Private Information was accessed and obtained by a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy.

69. Given the highly sensitive nature of the information involved, the Data Breach has also caused Plaintiff to suffer imminent harm arising from a substantially increased risk of additional fraud, identity theft, financial crimes, and misuse of his Private Information. This highly sensitive information is now in the hands of criminals as a direct and proximate result of Defendant's misconduct. It is also possible that other forms of information not yet disclosed by Defendant were also lost in the breach.

70. As a result of the actual harm Plaintiff has suffered and the imminent and substantial risk of future harm, the Data Breach has forced, and will force, Plaintiff to spend significant time and energy dealing with issues related to the Data Breach.

## CLASS ALLEGATIONS

71. Plaintiff brings this action on his own behalf and on behalf of all other persons similarly situated. The Classes which Plaintiff seeks to represent comprise of:

> **<u>Nationwide Class</u>**
> **All persons whose private information was accessed, compromised, or stolen in the data breach disclosed by TransUnion on August 26, 2025 (the "Class").**
>
> **<u>New Jersey Subclass</u>**
> **All persons residing in the State of New Jersey whose private information was accessed, acquired, or otherwise compromised in the data breach disclosed by Defendant on August 26, 2025 (the "New Jersey Subclass").**

These definitions may be further defined or amended by additional pleadings, evidentiary hearings, a class certification hearing, and orders of this Court.

72. The Class is comprised of millions of consumers that TransUnion had gathered information and compiled reports on and were part of the Data Breach (the "Class Members"). The Class is so numerous that joinder of all members is impracticable and the disposition of their claims in a class action will benefit the parties and the Court.

73. There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented in that the Class was harmed by the same unfair and unlawful practices. The questions of law and fact common to the Class predominate over questions which may affect individual Class members. Common questions of law and fact include, but are not limited to, the following:

a. Whether Defendant's failure to implement effective security measures to protect Plaintiff's and the Class's Private Information was negligent;

b. Whether Defendant's conduct constitutes an unlawful business act or practice under the New Jersey Consumer Fraud Act (N.J.S.A. § 56:8-2);

c. Whether Defendant violated any statutory duties under the Federal Trade Commission Act (15 U.S.C. § 45) and the New Jersey Consumer Fraud Act (N.J.S.A. § 56:8-2);

d. Whether Defendant represented to Plaintiff and the Class that it would protect Plaintiff's and the Class Members' Private Information;

e. Whether Defendant owed a duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

f. Whether Defendant breached a duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

g. Whether Class Members' Private Information was accessed, compromised, or stolen in the Data Breach;

h. Whether Defendant's conduct caused or resulted in damages to Plaintiff and the Class;

i. Whether Defendant failed to notify the public of the breach in a timely and adequate manner;

j. Whether Defendant knew or should have known that its systems, including but not limited to training protocols and policies, left it vulnerable to the Data Breach;

k. Whether Defendant adequately addressed the vulnerabilities that allowed for the Data Breach; and

l. Whether, as a result of Defendant's conduct, Plaintiff and the Class are entitled to damages and relief.

74. Plaintiff's claims are typical of the claims of the proposed Class, as Plaintiff and Class Members were harmed by Defendant's uniform unlawful conduct.

75. Plaintiff will fairly and adequately represent and protect the interests of the proposed Class. Plaintiff has retained competent and experienced counsel in class action litigation and other complex litigation.

76. Plaintiff and the Class have suffered injury because of Defendant's false, deceptive, and misleading representations and unlawful acts and practices.

77. The Class is identifiable and readily ascertainable. Notice can be provided to Class Members using techniques and a form of notice similar to those customarily used in class actions, and by internet publication, radio, newspapers, and magazines.

78. A class action is superior to other available methods for fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for proposed members of the Class to prosecute their claims individually.

79. The litigation and resolution of the Class's claims are manageable. Individual litigation of the legal and factual issues raised by Defendant's conduct would increase delay and expense to all parties and the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale, and comprehensive supervision by a single court.

80. Defendant has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and/or corresponding declaratory relief appropriate with respect to the Class as a whole. The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying adjudications with respect to individual member of the Class that would establish incompatible standards of conduct for Defendant.

81. Absent a class action, Defendant will likely retain the benefits of its wrongdoing. Because of the small size of the individual Class Members' claims, few, if any, Class Members could afford to seek legal redress for the wrongs complained of herein. Absent a representative action, Class Members will continue to suffer losses and Defendant (and similarly situated companies) will be allowed to continue these violations of law and to retain the proceeds of its ill-gotten gains.

**COUNT I**
**NEGLIGENCE**
**(On Behalf Of the Class)**

82. Plaintiff, individually and on behalf of the Class, herein repeats, realleges and fully incorporates all allegations in all preceding paragraphs.

83. Defendant owed a duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information. This duty included but was not limited to: (a) designing, implementing, and testing security systems to ensure that consumers' Private Information was consistently and effectively protected; (b) implementing security systems that are compliant with state and federal mandates; (c) implementing security systems that are compliant with industry practices; and (d) promptly detecting and notifying affected parties of a data breach.

84. Defendant's duties to use reasonable care arose from several sources, including those described below. Defendant had a common law duty to prevent foreseeable harm to others, including Plaintiff and Class Members, who were the foreseeable and probable victims of any inadequate security practices.

85. Defendant had a special relationship with Plaintiff and Class Members, which is recognized by laws and regulations, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to class members

from a data breach. Plaintiff and Class Members were compelled to entrust Defendant with their Private Information. At relevant times, Plaintiff and Class members understood that Defendant would take adequate security precautions to safeguard that information. Only Defendant had the ability to protect Plaintiff's and Class Members' Private Information it held.

86. Defendant knew or should have known that Plaintiff's and the Class Members' Private Information is information that is frequently sought after by criminals.

87. Defendant knew or should have known that Plaintiff and the Class members would suffer harm if their Private Information was leaked.

88. Defendant knew or should have known that its security systems were not adequate to protect Plaintiff's and the Class Members' Private Information from a data breach.

89. Defendant knew or should have known that adequate and prompt notice of the Data Breach was required such that Plaintiff and the Class could have taken more swift and effective action to change or otherwise protect their Private Information. Defendant failed to provide timely notice upon discovery of the data breach. Class Members were informed of the data breach on August 26, 2025, with not all receiving actual and direct notice, even though Defendant had learned of the data breach July 30, 2025.

90. Defendant's conduct as described above constituted an unlawful breach of its duty to exercise due care in collecting, storing, and safeguarding Plaintiff's and the Class Members' Private Information by failing to design, implement, and maintain adequate security measures to protect this information. Moreover, Defendant did not implement, design, or maintain adequate measures to detect a data breach when it occurred.

91. Defendant's conduct as described above constituted an unlawful breach of its duty to provide adequate and prompt notice of the data breach.

92. Plaintiff's and the Class Members' Private Information would have remained private and secure had it not been for Defendant's wrongful and negligent breach of its duties. The leak of Plaintiff's and the Class Members' Private Information, and all subsequent damages, was a direct and proximate result of Defendant's negligence.

93. Defendant's negligence was, at least, a substantial factor in causing Plaintiff's and the Class's Private Information to be improperly accessed, disclosed, and otherwise compromised, and in causing Class Members' other injuries arising out of the Data Breach.

94. The damages suffered by Plaintiff and the Class were the direct and reasonably foreseeable result of Defendant's negligent breach of its duties to adequately design, implement, and maintain security systems to protect Plaintiff's and Class Members' Private Information.

95. Defendant knew or should have known that its security for safeguarding Plaintiff's and Class Members' Private Information was inadequate and vulnerable to a data breach.

96. Defendant's negligence directly caused significant harm to Plaintiff and Members of the Class.

## COUNT II
## NEGLIGENCE *PER SE*
## (On Behalf Of the Class)

97. Plaintiff, individually and on behalf of the Class, herein repeats, realleges and fully incorporates all allegations in all preceding paragraphs.

98. Defendant's violation of the FTC Act also constitutes negligence per se, as those provisions are designed to protect individuals like Plaintiff and the Class Members from the harm associated with data breaches.

99. Defendant violated the FTC Act, which obligates companies to use reasonable measures to protect PII, by failing to comply with applicable industry standards, and by unduly

delaying reasonable notice of the actual breach. Defendant's conduct was particularly unreasonable given the nature and amount of PII obtained and stored, the foreseeable consequences of the data breach, and the exposure of Plaintiff's and Class Members' sensitive PII.

100. Defendant's violations of the FTC rules and other applicable standards constitute negligence per se.

101. Plaintiff and Class Members are within the category of persons the FTC Act was intended to protect.

102. The harm that occurred as a result of the Data Breach described herein is the type of harm the FTC Act was intended to guard against.

103. As a direct and proximate result of Defendant's negligence per se, Plaintiff and Class Members have been damaged as described herein, continue to suffer injuries as detailed above, are subject to the continued risk of exposure of their PII in Defendant's possession, and are entitled to damages in an amount to be proven at trial.

## COUNT III
## INVASION OF PRIVACY
## (On Behalf Of the Class)

104. Plaintiff, individually and on behalf of the Class, herein repeats, realleges and fully incorporates all allegations in all preceding paragraphs.

105. Plaintiff and Class Members had a reasonable and legitimate expectation of privacy in their Private Information that Defendant failed to adequately protect against compromise from unauthorized third parties.

106. Defendant owed a duty to Plaintiff and Class Members to keep their Private Information confidential.

107. Defendant failed to protect, and released to unknown and unauthorized third parties, Plaintiff's and Class Members' Private Information.

108. By failing to keep Plaintiff's and Class Members' Private Information safe, knowingly utilizing unsecure systems and practices, Defendant unlawfully invaded Plaintiff's and Class Members' privacy by, among others, (i) intruding into Plaintiff's and Class Members' private affairs in a manner that would be highly offensive to a reasonable person; (ii) failing to adequately secure their Private Information from disclosure to unauthorized persons and/or third parties; and (iii) enabling the disclosure of Plaintiff's and Class Members' Private Information without consent.

109. Defendant knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiff's and Class Members' position would consider its actions highly offensive.

110. Defendant knew, or acted with reckless disregard of the fact that, organizations handling PII are highly vulnerable to cyberattacks and that employing inadequate security and training practices would render them especially vulnerable to data breaches.

111. As a proximate result of such unauthorized disclosures, Plaintiff's and Class Members' reasonable expectations of privacy in their Private Information was unduly frustrated and thwarted, thereby causing Plaintiff and the Class Members undue harm.

112. Plaintiff seeks injunctive relief on behalf of the Class, restitution, as well as any and all other relief that may be available at law or equity. Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause irreparable injury to Plaintiff and Class Members.

113. Plaintiff and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and the class.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf Of The Class)**

114. Plaintiff, individually and on behalf of the Class, herein repeats, realleges and fully incorporates all allegations in all preceding paragraphs.

115. Defendant funds its data security measures entirely from their general revenues, including payments made for information regarding Plaintiff and the Class Members.

116. TransUnion benefitted by the conferral upon it of Plaintiff's and Class Members' Private Information and by its ability to retain, use and profit from that information.

117. TransUnion also knew that Plaintiff's and Class Members' PII was private and confidential, and the value of this information was dependent on TransUnion maintaining the privacy and confidentiality of this information

118. In exchange, Plaintiff and Class Members should have had their PII protected with adequate data security measures.

119. Defendant knew that Plaintiff and the Class conferred a benefit which it accepted, and through which Defendant was unjustly enriched. Defendant profited from these transactions and used Plaintiff's and the Class Members' Private Information for business purposes and to increase its revenues.

120. Defendant enriched itself by saving the costs it reasonably should have spent on the necessary data security measures to secure Plaintiff's and the Class Members' PII. Instead of providing the necessary level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiff and the Class, by using ineffective security measures, failing to pay money for the much needed training of its employees, failing to conduct the audits, or implementing other security measures discussed above.

121. Plaintiff and the Class suffered an injury as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and training.

122. Under the principles of equity and good conscience, Defendant should not be permitted to retain this economic benefit, because it gained this economic benefit by failing to implement appropriate data management and security measures as mandated by common law and statutory duties.

123. Plaintiff and the Class have no adequate remedy at law as discussed above.

124. Defendant should be compelled to disgorge its profits and/or proceeds that it unjustly received as a result of failing to properly secure Plaintiff's and Class Members' Private Information.

**COUNT V**
**DECLARATORY JUDGMENT**
**(On Behalf Of the Class)**

125. Plaintiff, individually and on behalf of the Class, herein repeats, realleges and fully incorporates all allegations in all preceding paragraphs.

126. The Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., authorizes this Court to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief.

127. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

128. Defendant owes a duty of care to Plaintiff and Class Members which require it to adequately secure its Private Information when it chose to accept and store Plaintiff's and Class Members' Private Information.

129. Defendant still possesses Plaintiff's and Class Members' Private Information.

130. Defendant does not specify in the Data Breach notification what specific and verifiable steps it has taken to prevent a similar breach from occurring again.

131. Plaintiff and Class Members are at risk of harm due to the exposure of their Private Information and the Defendant's failures to address the security failings that lead to such exposure.

132. An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard Plaintiff's and Class Members' Private Information and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and the Class from further data breaches that compromise their Private Information.

133. Plaintiff and the Class, therefore, seek a declaration that (1) each of Defendant's existing security measures do not comply with its obligations and duties of care to provide reasonable security procedures and practices appropriate to the nature of the information to protect consumers' Private Information, and (2) to comply with its duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

a. Prohibiting Defendant from engaging in the wrongful acts stated herein (including Defendant's utter failure to provide notice to all affected consumers);

b. Requiring Defendant to implement adequate security protocols and practices to protect consumers' Private Information consistent with the industry standards, applicable regulations, and federal, state, and/or local laws;

c. Mandating proper notice be sent to all affected consumers, and posted publicly;

d. Requiring Defendant to protect all data collected;

e. Requiring Defendant to delete, destroy, and purge the Private Information of Plaintiff and Class Members unless Defendant can provide reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

f. Requiring Defendant to implement and maintain a comprehensive security program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' Private Information;

g. Requiring Defendant to engage independent third-party security auditors and conduct internal security audit and testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis;

h. Requiring Defendant to engage independent third-party security auditors and/or internal personnel to run automated security monitoring;

i. Requiring Defendant to create the appropriate firewalls, and implement the necessary measures to prevent further disclosure and leak of any additional information;

j. Requiring Defendant to conduct systematic scanning for data breach related issues;

k. Requiring Defendant to train and test its employees regarding data breach protocols, archiving protocols, and conduct any necessary employee background checks to ensure that only individuals with the appropriate training and access may be allowed to access the Private Information data; and,

l. Requiring all further and just corrective action, consistent with permissible law and pursuant to only those causes of action so permitted.

134. The Court can, and should, issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with the law and industry standards to protect Plaintiff's and Class Members' Private Information.

135. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach of the Defendant's systems or networks. The risk of another breach is real, immediate, and substantial.

136. The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. If another data breach occurs, the Plaintiff and the Class will likely be subjected to fraud, identity theft, and other harms described herein. However, the cost to the Defendant of complying with an injunction by employing reasonable prospective data security measures is minimal given they have preexisting legal obligations to employ these measures.

**COUNT VI**
**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT, N.J.S.A. § 56:8-2, *et seq.***
**(On Behalf Of Plaintiff and the New Jersey Subclass)**

137. Plaintiff, individually and on behalf of the California Subclass, herein repeats, realleges and fully incorporates all allegations in all preceding paragraphs.

138. A. Unfair Practices

139. Under the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-2, a business practice is "unfair" if it causes substantial consumer injury that outweighs any legitimate benefits to consumers, and the injury could not reasonably have been avoided by the consumer.

140. Defendant's conduct, as alleged herein, confers no benefit to consumers. Mishandling consumer data demonstrates a blatant disregard for the privacy and security of New Jersey consumers.

141. Defendant's conduct causes harm to consumers whose private information it obtained but failed to protect, resulting in unauthorized disclosure and potential misuse.

142. Defendant's failure to implement and maintain reasonable data security measures contravenes legislatively-declared public policy designed to protect consumers' information. These policies are reflected in law, including the Federal Trade Commission Act, 15 U.S.C. § 45, and New Jersey statutes such as the Identity Theft Prevention Act, N.J.S.A. § 56:11-1 et seq.

143. Plaintiff and the New Jersey Subclass could not have reasonably avoided the injuries caused by Defendant's conduct.

144. The injuries caused by Defendant's conduct outweigh any purported benefits.

145. Defendant's conduct, as alleged, is false, deceptive, misleading, and constitutes an unfair business practice under N.J.S.A. § 56:8-2.

146. Defendant could have furthered its legitimate business interests through lawful and non-deceptive means.

147. Defendant's misconduct continues in its operations, as there is no evidence that it has implemented adequate measures to secure New Jersey consumers' private information.

148. Plaintiff and the New Jersey Subclass seek an order enjoining Defendant from continuing its unfair business practices and compelling it to implement reasonable safeguards to protect consumer private information. Such safeguards include improving data security systems, securely deleting unnecessary data, adopting robust training protocols for employees, and timely notifying affected consumers of breaches

149. B. Unlawful Practices

150. The New Jersey Consumer Fraud Act also treats any violation of state or federal law as an unlawful practice.

151. Defendant's conduct, as alleged, violates multiple statutory duties, including:

152. N.J.S.A. § 56:8-2 (Consumer Fraud Act);

153. N.J.S.A. § 56:11-1 et seq. (Identity Theft Prevention Act);

154. Federal Trade Commission Act, 15 U.S.C. § 45; and

155. Applicable common law duties to maintain reasonable data security.

156. Defendant knew or should have known that its practices were unlawful.

157. Defendant's failure to maintain adequate data security constitutes an unlawful business practice under the New Jersey Consumer Fraud Act.

158. Defendant could have pursued legitimate business objectives without engaging in unlawful conduct.

159. Defendant's wrongful conduct is ongoing and part of a generalized course of conduct affecting thousands of consumers.

160. Plaintiff and the New Jersey Subclass have suffered injury-in-fact and lost money or property as a result of Defendant's unlawful conduct.

161. Plaintiff and the New Jersey Subclass seek an order:

- Enjoining Defendant from continuing its unlawful practices;
- Requiring Defendant to implement reasonable and adequate security measures to protect consumer private information; and
- Ordering restitution for money or property wrongfully acquired by Defendant through its unlawful practices.

162. Equitable relief is necessary because no adequate remedy at law exists.

163. Defendant has not implemented sufficient protections to prevent future breaches nor provided adequate notice to affected New Jersey consumers; equitable relief will prevent ongoing and future harm.

164. Injunctive relief is also necessary to prevent the public from being misled by Defendant's misrepresentations regarding the privacy and security of consumer information.

165. For the reasons set forth above, Plaintiff and the New Jersey Subclass are entitled to equitable relief under the Consumer Fraud Act, including restitution and injunctive relief to protect the private information of all affected consumers.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment and relief on all cause of action as follows:

1. Injunctive Relief:

- Enjoining Defendant from continuing its unlawful and unfair business practices;
- Requiring Defendant to implement and maintain reasonable security measures to safeguard consumer private information;
- Mandating the timely deletion, secure archiving, or anonymization of consumer data that is no longer necessary for legitimate business purposes;
- Requiring Defendant to implement robust employee training, policies, and protocols to ensure the protection of consumer private information;
- Ordering Defendant to provide prompt and clear notice to consumers in the event of any future data breaches.

2. Restitution:

- Ordering Defendant to return, restore, or otherwise make whole all money or property wrongfully acquired through its unlawful or unfair practices.

3. Compensatory Damages:

- Awarding damages to Plaintiff and the New Jersey Subclass for actual economic losses resulting from Defendant's conduct.

4. Equitable Relief:

- Granting any other equitable relief necessary to prevent future harm, including but not limited to measures addressing Defendant's ongoing or systematic mishandling of consumer private information.

5. Attorneys' Fees and Costs:

- Awarding reasonable attorneys' fees, costs, and expenses pursuant to N.J.S.A. § 56:8-19 and any other applicable law.

6. Pre- and Post-Judgment Interest:

- Awarding interest as permitted by law.

7. Further Relief:

- Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a trial by jury for all claims.

DATED: September 15, 2025

*/s/ Hassan A. Zavareei*
Hassan A. Zavareei (Bar No. 456161)
*hzavareei@tzlegal.com*
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue NW
Suite 1010

Washington, D.C. 20006
Telephone: (202) 973-0900
Facsimile: (202) 973-0950

Sabita J. Soneji*
*ssoneji@tzlegal.com*
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808

*Counsel for Plaintiff and Class*

**pro hac to be filed*